UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

DOLWIN CORMIA,[1]                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )      No.     3:23-CV-291-TAV-JEM
                                     )
MORGAN COUNTY WARDEN MIKE            )
PARRIS, SGT. ELIZABETH NOYEM,        )
ADAM MORRIS, RICHARD                 )
COLSTON, CO BUNCH, SGT.              )
CRABTREE, SGT. MOORE, CO             )
CHEVY, DANA DANIEL, TYGER            )
HERBST, ROSCOE BYRD, BUTCH           )
SIMMS, FRANK STRADA, STACEY          )
OAKES, BRANDON EVANS, HARY           )
TOAL, TOSHIA RIDENOUR, and           )
MORGAN COUNTY,[2]                    )
                                     )
            Defendants.              )

## MEMORANDUM OPINION AND ORDER

Plaintiff, a Tennessee Department of Correction ("TDOC") prisoner housed in the

Morgan County Correctional Complex ("MCCX"), has filed (1) two unsigned motions

---

[1] In his filings, Plaintiff spells his name first name as "Dorwin" [*See*, *e.g.*, Doc. 1, p. 1]. But both Plaintiff's inmate trust account certificate and the Tennessee Department of Correction's database, *see* https://foil.app.tn.gov/foil/search.jsp (last visited Feb. 13, 2024), establish that his first name is Dolwin. As such, the Clerk is **DIRECTED** to update the Court's docket to reflect this.

[2] In the portion of his complaint where he sets forth the Defendants' names, Plaintiff uses the term "et al." [Doc. 7, p. 3]. The Court liberally construes this designation to refer to Frank Strada, Stacey Oakes, Brandon Evans, Hary Toal, Toshia Ridenour, Dana Daniel, Tyger Herbst, Roscoe Byrd, and Butch Simms, as Plaintiff refers to these individuals as "Defendants" in the body of his complaint [*See*, *e.g.*, *id.* at 15–16, 24] but did not include these individuals in the complaint's list of Defendants [*Id.* at 3]. The Court has also included Morgan County as a Defendant based on Plaintiff's references to this municipality and municipal liability in his complaint [*See*, *e.g.*, *id.* at 17–18, 42–43].

regarding computation of deadlines [Docs. 1, 2]; (2) a motion for leave to proceed *in forma pauperis* [Doc. 6]; (3) a complaint [Doc. 7]; (4) an unsigned motion regarding service of process [Doc. 8]; (5) an unsigned motion regarding fees [Doc. 9]; (6) a request for the Clerk to enter civil summonses [Doc. 10]; and (7) an unsigned motion to supplement the complaint [Doc. 11], all of which are now before the Court. The Court will address these filings in turn.

## I.    MOTIONS REGARDING DEADLINES

As set forth above, Plaintiff has filed two motions regarding deadlines [Docs. 1, 2]. It appears that Plaintiff requests that the Court (1) allow him additional time to file his complaint in this action while he exhausts the grievance procedure; (2) stay this proceeding while he exhausts the grievance procedure; and/or (3) require TDOC officials to respond to his grievance [*Id.*].

The Court finds that Plaintiff is not entitled to relief based on these motions. First, Plaintiff relies at least in part on Tennessee Code Annotated § 41-21-806 to request that the Court grant him an extension of time to file a complaint and/or stay this action so that he may complete the grievance process [*Id.*]. But the Prison Litigation Reform Act ("PLRA"), not Tennessee law, governs whether Plaintiff properly exhausted his available administrative remedies prior to filing this action. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It requires "proper

2

exhaustion" of administrative remedies for all claims. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). As such, prisoners must complete "the administrative review process in accordance with the applicable procedural rules, including deadlines" before filing a lawsuit in federal court. *Id.* at 88.

Moreover, while Plaintiff also requests that the Court require that prison officials respond to his grievance, he does not have a constitutional right to an effective grievance procedure. *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003) (providing that a prisoner has "no inherent constitutional right to an effective prison grievance procedure"). And Plaintiff does not set forth any extraordinary reason for the Court to intervene in the MCCX grievance process. *Glover v. Johnson*, 855 F.2d 277, 287 (6th Cir. 1988) (setting forth public policy concerns regarding court interference with jail administration and instructing that courts should not "attempt to administer any portion of a state correctional system program except in the most compelling situations").

Additionally, Plaintiff filed his complaint, which addresses incidents on June 7, 2023, on August 1, 2023[3] [Doc. 7, pp. 3, 53]. Thus, Plaintiff filed his complaint within the

---

[3] A prisoner's complaint is deemed "filed" when the prisoner submits it to prison officials for mailing. *See, e.g., Houston v. Lack*, 487 U.S. 266, 273 (1988). Under Sixth Circuit precedent, the date the prisoner signed the document is typically deemed the date of filing. *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir 2008) (noting that the signing date on a pro se prisoner's pleading is the filing date, unless there is evidence to the contrary).

3

applicable statute of limitations,[4] which renders his request for additional time to file a complaint moot.

Accordingly, Plaintiff's motions requesting that the Court stay this action, extend his time to file a complaint, and/or require prison officials to respond to his grievance [Docs. 1, 2] are improper and unnecessary, and they are therefore **DENIED**.

## II.    FILING FEE

As it appears from his motion for leave to proceed *in forma pauperis* [Doc. 6] that Plaintiff is unable to pay the filing fee in one lump sum, this motion is **GRANTED**.

Plaintiff is **ASSESSED** the civil filing fee of $350.00.  28 U.S.C. § 1914(a).  The custodian of Plaintiff's inmate trust account is **DIRECTED** to submit to the Clerk, U.S. District Court, 800 Market Street, Suite 130, Knoxville, Tennessee 37902, as an initial partial payment, whichever is the greater of: (a) twenty percent (20%) of the average monthly deposits to his inmate trust account; or (b) twenty percent (20%) of the average monthly balance in his inmate trust account for the six-month period preceding the filing of the complaint.   28 U.S.C. § 1915(b)(1)(A) and (B).   Thereafter, the custodian of Plaintiff's inmate trust account is directed to submit twenty percent (20%) of his preceding monthly income (or income credited to his trust account for the preceding month), but only when such monthly income exceeds ten dollars ($10.00), until the full filing fee has been paid to the Clerk.  28 U.S.C. § 1915(b)(2).

---

[4] Tennessee's one-year statute of limitations for personal injury actions applies to Plaintiff's § 1983 claims. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); Tenn. Code Ann. § 28-3-104.

4

The Clerk is **DIRECTED** to provide a copy of this order to the Court's financial deputy and the custodian of inmate trust accounts at Plaintiff's facility to ensure compliance with the PLRA requirements for payment of the filing fee.

## III.    COMPLAINT SUPPLEMENT

Plaintiff has filed an unsigned motion seeking to supplement his complaint [Doc. 11].  While this motion is mostly unintelligible, reading it as a whole and liberally construing it in Plaintiff's favor, it appears that Plaintiff seeks to supplement his complaint with (1) a request that the Court excuse any failure to properly exhaust his administrative remedies because the MCCX grievance system is "inadequate, unfair, [and/or] futile" and/or he was improperly prevented from appealing his grievance response; (2) an assertion that he should be allowed to proceed on his exhausted claims; and/or (3) an assertion that he does not have to exhaust his administrative remedies [*Id.* at 1–6].

The Court will deny this motion because the supplement that Plaintiff seeks to add to his complaint does not comply with the Court's local rule regarding amendment of pleadings, fails to state a claim upon which relief may be granted under § 1983, and is unnecessary.

First, Local Rule 15.1 requires a party seeking to amend a pleading to file a complete proposed amended pleading that does not incorporate any prior pleading and provides that failure to do so is grounds to deny the motion.  E.D. Tenn. L.R. 15.1.  As Plaintiff's proposed complaint supplement is not a complete proposed amended pleading, it is subject to dismissal based on this rule.

Also, Plaintiff's proposed supplement to his complaint fails to state a claim upon which relief may be granted under § 1983 and is unnecessary. Specifically, in this supplement, Plaintiff does not appear to seek relief. Instead, Plaintiff essentially attempts to preempt any argument from Defendants that he has not exhausted his administrative remedies. But it is unnecessary for Plaintiff to plead exhaustion of his administrative remedies in his complaint. *Jones v. Bock*, 549 U.S. 199, 214–16 (2007) (providing that failure to exhaust administrative remedies is an affirmative defense that "inmates are not required to specially plead or demonstrate . . . in their complaints"). And even if the Court could liberally construe the complaint supplement to seek § 1983 relief based on the allegations that prison officials have not allowed Plaintiff to exhaust his administrative remedies, the Court would not allow Plaintiff to supplement his complaint with this claim, as it fails to state a claim upon which relief may be granted under § 1983. *Argue*, 80 F. App'x at 430; *Griffith v. Whitesell*, No. 3:08-0385, 2008 WL 3852415, *5 (M.D. Tenn. Aug. 14, 2008) ("The Court is not required to allow amendments that assert obviously frivolous claims or claims that could not withstand a motion to dismiss." (citation omitted)).

Accordingly, Plaintiff's motion to supplement his complaint [Doc. 11] is **DENIED**. Should Defendants raise the affirmative defense that Plaintiff failed to exhaust his available administrative remedies prior to filing this action, Plaintiff may respond with his arguments regarding this issue at that time.

6

## IV. COMPLAINT SCREENING

### A. Standard

Under the PLRA, district courts must screen prisoner complaints and shall, at any time, *sua sponte* dismiss any claims that are frivolous or malicious, fail to state a claim for relief, or are against a defendant who is immune. *See* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Benson v. O'Brian*, 179 F.3d 1014 (6th Cir. 1999). The dismissal standard the Supreme Court set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) "governs dismissals for failure to state a claim under [28 U.S.C. §§ 1915(e)(2)(B) and 1915A] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive a PLRA initial review, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Formulaic and conclusory recitations of the elements of a claim do not state a plausible claim for relief. *Id.* at 681. Likewise, an allegation that does not raise a plaintiff's right to relief "above a speculative level" fails to state a plausible claim. *Twombly*, 550 U.S. at 570. However, courts liberally construe pro se pleadings and hold them to a less stringent standard than lawyer-drafted pleadings. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

A claim for violation of 42 U.S.C. § 1983 requires a plaintiff to establish that a person acting under color of state law deprived him a federal right. 42 U.S.C. § 1983.

7

### B.     Allegations

Plaintiff has listed Warden Mike Parris, Sergeant ("Sgt.") Elizabeth NoYem, Correctional Officer ("CO") Adam Morris, CO Richard Colston, CO Bunch, Sgt. Crabtree, Sgt. Moore, and CO Chevy as Defendants [*Id.* at 1, 3].  Also, as set forth above, the Court liberally construes the complaint to seek relief from TDOC Commissioner Frank Strada, Assistant Warden of Treatment Stacey Oakes, Corporal ("Cpl.") Brandon Evans, Cpl. Tyger Herbst, Captain ("Capt.") Roscoe Byrd, Warden of Security Butch Simms, Hary Toal, Toshia Ridenour, Dana Daniel, and Morgan County as Defendants.

Plaintiff alleges that, one day when he was leaving the MCCX chow hall, Sgt. NoYem told Plaintiff to give her his belt [Doc. 7, pp. 3–4].  Plaintiff asked her why and what was wrong with his belt, and Sgt. NoYem responded that the belt had letters on it and again demanded that Plaintiff give it to her [*Id.* at 4].  Plaintiff told Sgt. NoYem that he has had the belt for at least 10 years, asked how the belt was now illegal, and asked Sgt. NoYem to show him where the rule book said that he could not have a belt with the letters "L.A." on it.  Sgt. NoYem responded that she did not have to show him, again demanded the belt, and told Plaintiff that if he did not give her the belt, he would go to high security, and she would therefore get the belt that way [*Id.*].

Plaintiff took off the belt and tossed it toward the table, but the belt missed the table and hit the floor [*Id.*].  Sgt. NoYem then told Plaintiff to get on the wall because he was "going to high security for sure" [*Id.*].  Plaintiff apologized for the belt hitting the floor and tried to pick it up, at which point Sgt. NoYem used her hand to "unlawfully" push Plaintiff

[*Id.* at 4–5]. Plaintiff told Sgt. NoYem not to do that before turning and facing CO Morris and stating "it[']s not that serious it[']s just a belt" [*Id.* at 5].

CO Morris then grabbed Plaintiff by the front of his shirt and pushed him into the wall [*Id.*]. Plaintiff pushed CO Morris's hand away and told CO Morris that he did "not have to do all of this[,] it[']s a f[*]cking belt." CO Morris then "made a fist [and] was . . . attempting to throw his fist at [] Plaintiff in order to c[]ause him harm," so Plaintiff hit CO Morris "with a 2 []to[] 4 punch []sequence[]," at which point CO Morris fell to the floor. Sgt. NoYem then began to run at Plaintiff in a "threat[en]ing manner with a cocked closed fist in order to strike him" while using a racial slur, "so Plaintiff hit her with [a] 2 []to[] 4 pu[n]ch []sequence" [*Id.*]. Then, while CO Morris and Sgt. NoYem were on the floor, CO Colston came from Plaintiff's right side, and Plaintiff is not sure how many times he hit CO Colston before he backed away [*Id.*; Doc. 7-1, p. 55].

CO Morris then approached Plaintiff again, and Plaintiff "hit him with a []3[] pu[n]ch []sequence[]" [Doc. 7, p. 6]. CO Morris fell to the floor, and when Plaintiff later noticed CO Morris moving on the floor, Plaintiff kicked him in the face and knocked him back to the floor [*Id.*].

CO Bunch then ran toward Plaintiff, at which point Plaintiff "hit [him] with a []2[] pu[n]ch []sequence[]" [*Id.*]. Plaintiff and CO Bunch then wrestled until other officers arrived and attempted to gain control of Plaintiff "by taking him to the ground [and] handcuffing [him]" [*Id.*].

9

It appears that after officers handcuffed Plaintiff, they walked him out of the chow hall [*Id.* at 7; Doc. 7-1, p. 56]. Then, while Plaintiff was "by the sidewalk guardshack," Sgt. Crabtree threw Plaintiff on the grass, slapped him in the head, and spat on him before stating that Plaintiff's "black [*]ss [wa]s going to learn about hittin[g] our white wom[e]n boi [sic]" [Doc. 7, p. 7]. Sgt. Crabtree then "ripp[ed] off [] Plaintiff[']s pants [and] shoes" before tightening the handcuffs further around Plaintiff's wrist and asking if they were tight enough while calling Plaintiff a "Black b[*]stard" and telling Plaintiff that he had "hit a pregnant white woman" [*Id.*].

Officers took Plaintiff to intake, where officers called him derogatory names and racial slurs, and someone hit him in the head twice [*Id.*]. Sgt. Moore also hit Plaintiff with a black walkie talkie and made comments to Plaintiff indicating that the events were "just the begin[n]ing," using racial slurs, and referring to Sgt. NoYem as "our pregnant white sister" [*Id.* at 7–8].

As part of his complaint, plaintiff requests to see to see the intake video, which he claims "shows all . . . Defendants/staff which are named throwing Plaintiff to the floor [and] uncuff[ing] Plaintiff," at which point CO Chevy tried to kick him in the face, but Plaintiff blocked him [*Id.*]. Plaintiff then felt someone hitting him from behind and turned and hit Sgt. Moore, before punching CO Chevy in the face. After that, Plaintiff heard the sound of himself being tased [*Id.*].

"The next thing Plaintiff remember[s] [i]s waking up" with his hands handcuffed behind him, his feet shackled, and his left eye completely swollen shut [*Id.*]. Plaintiff's

right eye was very swollen, but he could barely see out of it to tell "that he was l[]ying in a pool of blood" [*Id.* at 9]. Plaintiff saw someone with a camcorder, who he assumes was "[t]he [l]ead I.A. [] Brandon Foster." The MCCX doctor came in and asked Plaintiff to give him a urine sample and told him that if he did not, the doctor would place a catheter. Plaintiff provided the sample, and the doctor cut off all of Plaintiff's clothes except his boxers and examined him [*Id.*].

Two men read Plaintiff his *Miranda* rights and told him that they would "forward . . . the[ir] finding[]s[]" to the next level [*Id.* at 10]. The nurse gave Plaintiff naproxen and eyedrops and examined him [*Id.*]. Unspecified officers then took Plaintiff to the University of Tennessee Medical Center for x-rays and an examination [*Id.* at 10–11].

The next 42 pages of Plaintiff's complaint contain mostly legal allegations, conclusions, citations, and/or arguments, many of which are redundant and at least partially unintelligible [*Id.* at 11–53]. Nevertheless, the Court will now endeavor to summarize plaintiff's allegations and arguments.

Plaintiff asserts that the Court has jurisdiction in this case [*Id.* at 11]. Plaintiff then discusses Commissioner Strada and Warden Parris's official positions and claims that they are both legally responsible for operation of MCCX, and Warden Parris is responsible for MCCX inmates' welfare [*Id.* at 11–12].

Plaintiff next sets forth allegations about Defendant officers' oaths and affirmations, states that he has sued all Defendants in their individual capacities, and claims that Commissioner Strada and Warden Parris "ha[ve] open[ed] a [d]ark [d]oor by violat[ing]"

11

their duties under Tennessee Code Annotated § 4-3-606 [*Id.* at 12–13]. Plaintiff also refers to the Eighth and Fourteenth Amendments and claims that Commissioner Strada has failed to perform his duty under Tennessee law to provide reasonable safety to all people in Tennessee institutions through "his understaff" at MCCX, namely Sgt. NoYem, CO Morris, Co Colston, CO Bunch, Sgt. Crabtree, Sgt. Moore, and CO Chevy [*Id.* at 13–14].

Plaintiff then asserts that he "[h]as a clear right to adequate food, shelter, clothing, and medical" and that the Court must determine whether a liberty interest exists for him and whether Defendants' "breach of security" and "use of force abuse" was deliberate indifference [*Id.* at 14–15]. Plaintiff also states that his force claims "fall[] against" Warden Simms [*Id.* at 15]. Plaintiff then refers to "freedom of movement [and] training" before stating that the misconduct of "the understaff" and Warden Parris and Assistant Warden Oakes amounts to "extreme and outrageous . . . conduct," breach of contract due to the officers' oaths and affirmations under Tennessee law, and a violation of due process under the Fourteenth Amendment that caused him "mental [and] emotional distress" [*Id.* at 15–16]. Plaintiff further claims that Warden Simms, Warden Parris, and Assistant Warden Oakes are liable due to "supervisory liability," that Tennessee Code Annotated § 8-8-201, which sets forth a sheriff's official duties, is the moving force that caused the violations in this case, and that Commissioner Strada therefore was "personally involved []or[] acquiesced" in the "understaff officials['] . . . illegal actions" [*Id.* at 16].

Plaintiff then cites *Ex Parte Young*, 209 U.S. 123 (1908) and claims that it stands for the assertion that a state official who acts in a manner that violates the federal

12

constitution is "stripped" and subject to consequences for his "individual conduct" [*Id.* at 16–17]. Plaintiff also claims that the Eleventh Amendment does not apply because "the state has no power to impart" itself "any kind of immunity" under *Ex Parte Young* [*Id.* at 17].

Plaintiff also makes allegations regarding service of process, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and Tennessee law, specifically Tennessee Code Annotated § 8-8-302 *et al*., that he alleges "waive[s] government immunity" [*Id.* at 18]. He then refers to official capacity claims under the Tennessee Government Tort Liability Act ("TGTLA") before citing § 1343, making unclear arguments regarding county liability for deliberate indifference and jurisdiction, and stating he can "recover damages for injury to his person []or[] property" due to a deprivation of rights or privileges in furtherance of a conspiracy under 42 U.S.C. § 1985 [*Id.* at 18–20].

Plaintiff then cites § 1983 and claims that Defendants caused him "mental anguish [and] suffering" due to their uses of force and that he is a "Navy sailor" who was triggered by his "antisocial-personality disorder [and] . . . lack of impulse control" [*Id.* at 20–21]. Plaintiff also demands an investigation of the "breach [] of [] security," states that TDOC policy provides that a disciplinary report that "fails to adequately state an offense," "contains errors," and does not contain an offender signature must be dismissed, and states that his disciplinary report is void because it does not contain his signature or a date/time entry with employee initials, before referring to double jeopardy and an unlawful signature by Cpl. Herbst [*Id.* at 21–22]. He additionally appears to allege that Capt. Byrd made

13

fraudulent statements regarding his disciplinary proceeding [*Id.* at 22–23]. Plaintiff therefore states that he brings a claim for "civil conspiracy" against these Defendants and asserts that "Exhibit #8" to his complaint supports that claim [*Id.* at 23–24].

Next, Plaintiff claims that Daniel, Toal, Ridenour, Cpl. Herbst, and Capt. Byrd are liable for retaliation because they "took []an[] adverse action against him that would deter a person of ordinary firmness from continuing to engage in [] conduct [and] that [] adverse action was taken (at least in part) because of [] protected conduct . . . ." [*Id.* at 24–25]. Plaintiff also asserts that unspecified actions deprived him of "life, liberty, [and] property . . . . without due process" and again makes allegations regarding supervisory liability for Warden Parris and Commissioner Strada, as well as the "understaff['s]" breach of contract through violation of oaths and affirmations and his "mental 'or' emotional anguish" [*Id.* at 25–27]. Plaintiff then states that Defendants' "mis[]conduct" violated his clearly established Eighth Amendment right to be free of cruel and unusual punishment [*Id.* at 27].

The remainder of the complaint falls under the heading "Relief" [*Id.* at 28–53]. Plaintiff first states that Defendants' uses of force amounted to deliberate indifference and caused him injuries and claims that other inmates previously experienced similar mistreatment, but Warden Parris did not take action to correct it or discipline employees, and that he therefore sues Warden Parris and Warden Simms in their official capacities [*Id.* at 28–29]. He further asserts that this reasoning applies to Commissioner Strada because Tennessee law directs the Tennessee Correction Institute to establish minimum standards [*Id.* at 29–30].

14

Plaintiff then claims that "[a]ll understaff Defendants," including Sgt. NoYem, CO Morris, CO Colston, Sgt. Moore, Sgt. Crabtree, CO Bunch, CO Chevy, Cpl. Herbst, and Capt. Byrd, are liable for breach of contract arising from their oaths and affirmations, which amounts to perjury under Tennessee law [*Id.* at 30–31]. He also asserts that these Defendants are liable for compensatory damages due to their contract breach and uses of force that caused him "mental [and] emotional distress" [*Id.* at 31]. He additionally states that all Defendants are liable for punitive damages [*Id.* at 32].

Plaintiff next refers to Title VI of the Civil Rights Act of 1964, which he contends requires federally assisted programs to be free of discrimination, states that the TDOC also requires its activities to "be conducted without regard to race, color []or[] national origin," and refers to retaliation [*Id.* at 33]. He then states that Commissioner Strada may be liable for tort actions in the amount of $300,000 per claimant and $1 million per occurrence [*Id.*], and that he seeks $1 million from Commissioner Strada for each of the following claims: (1) "breach of security" by the "understaff"; (2) failure to protect by the "understaff"; and (3) use of force by the "understaff" [*Id.* at 34]. He also states that he seeks $300,000 from Commissioner Strada for "supervisory liability" and $1 million from Commissioner Strada and Morgan County based on a Sixth Circuit case regarding municipal liability [*Id.* at 34–35, 43].

Plaintiff then generally asserts that MCCX's "sanitary conditions [and] bedding were deplorable [and] specific medical care was deplorable . . . ." and seems to indicate that Defendant officers and Commissioner Strada are liable for this [*Id.* at 35–36]. He also

15

suggests that Commissioner Strada is liable for failing to correct the situation or to discipline Defendants for other similar uses of force, which he claims "sufficiently evidences a policy []or[] custom" [*Id.* at 35–37].

Plaintiff states that Cpl. Evans engaged in a civil conspiracy to deny his civil rights and Eighth Amendment grievance through a notification that the grievance was inappropriate and/or by failing to forward the grievance to a Title VI coordinator, which he claims (1) violated his First and Fourteenth Amendment, equal protection, and due process rights; (2) denied him access to the courts; (3) violated TDOC policy; (4) was a breach of contract that amounts to perjury; (5) was an act of retaliation; (6) intentionally inflicted emotional distress upon him; and (7) amounted to civil conspiracy [*Id.* at 37–45]. Plaintiff also indicates that Cpl. Evans's failure to process his grievance amounted to execution of a government policy for which a municipality and/or Assistant Warden Oakes may be liable under *Monell* [*Id.* at 42] and states that he seeks $1 million from Commissioner Strada based on Cpl. Evans's deliberate indifference to his grievance in violation of the First Amendment and Plaintiff's right to due process pursuant to a civil conspiracy [*Id.* at 43–44].

Plaintiff then states that the disciplinary report contains a lie, the video footage shows two officers transported him to the University of Tennessee Medical Center, and the unlawful uses of force by MCCX officers caused him various compensable injuries, are on video, and are due to a failure to train and supervise [*Id.* at 46–48].

16

Plaintiff then "asks" Commissioner Strada to "uphold" a TDOC policy regarding employee discipline and asks for copies of disciplinary documents to be placed in Defendants' personnel files and provided to the Court and Plaintiff for discovery [*Id.* at 48–49]. He also states that he is entitled to a jury trial under the Seventh Amendment, that he raises an Eighth Amendment claim, and that he seeks $13 million for a jury verdict in his favor or a "fair settlement deal between half of the max cap" with all Defendants [*Id.* at 50, 53]. Plaintiff indicates that he seeks this relief "in order to keep [himself] from going to trial before a jury due to the [TDOC] understaff errors by 8th amendment use of force/attack et al." [*Id.* at 50].

Plaintiff also states that the Federal Rules only require a short and plain statement showing he is entitled to relief and that Defendants, including Commissioner Strada, must now defend this case, before setting forth various legal allegations regarding qualified immunity [*Id.* at 51–52].

### C. Analysis

#### 1. Official Capacity Claims

It is apparent from Plaintiff's complaint that he has sued at least some Defendants in their official capacities. It is also apparent from the complaint that all Defendants work for the TDOC or the MCCX, which is a prison facility that the TDOC runs. https://www.tn.gov/correction/state-prisons/state-prison-list/morgan-county-correctional-complex.html (last visited Feb. 13, 2024).

17

As such, the Court treats Plaintiff's claims against Defendants in their official capacities as claims against the TDOC. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Monell* at 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."). And because the TDOC is an arm of the State of Tennessee, a suit against a TDOC employee in his official capacity is a suit against the State. *See Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350, 355 (6th Cir. 2006) (holding the TDOC is equivalent to the "State").

However, "a State is not a person within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Hix*, 196 F. App'x at 355. Additionally, the Eleventh Amendment prohibits suits against a state or its agencies in federal court for damages, unless Congress has abrogated its immunity, or the state has expressly waived it. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–101 (1984); *Quern v. Jordan*, 440 U.S. 332, 345 (1979). Tennessee has not waived its immunity to suit under § 1983. *Berndt v. State of Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986).

Plaintiff cites *Ex Parte Young*, 209 U.S. 123 (1908) in his complaint. This case recognized an exception to state sovereign immunity, stating that:

> [I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties . . . an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

18

*Ex Parte Young*, 209 U.S. at 155–56. Thus, under the *Ex Parte Young* doctrine, a plaintiff may "bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017) (citing *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008)). "To determine if *Ex Parte Young* applies, [the Court] 'need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Dubuc v. Mich. Bd. of Law Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003)) (internal citation and quotation marks omitted).

In this case, Plaintiff has not identified any ongoing constitutional violation for which he seeks prospective injunctive relief, or for which he would be entitled to such relief. *See Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (noting injunctive relief is an extraordinary remedy granted "only if the movant carries his or her burden of proving that the circumstances clearly demand it"). Thus, *Ex Parte Young* does not apply in this case.

Accordingly, Plaintiff cannot maintain suit against Defendants in their official capacities, and all such claims will be **DISMISSED**.

### 2. Access to Courts

In his complaint, Plaintiff claims that Cpl. Evans's handling of his grievance denied him access to the courts [Doc. 7, p. 38]. However, as Plaintiff does not provide any facts suggesting that Cpl. Evans's handling of his grievance has prejudiced him in any way, he

19

has failed to adequately allege a constitutional violation. *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (holding that a plaintiff must plead and prove that his meritorious claims have been prejudiced by the alleged denial of adequate legal resources to state a claim for denial of access to courts (citing *Lewis v. Casey*, 518 U.S. 343 (1996)). Accordingly, this allegation fails to state a claim upon which relief may be granted under § 1983, and it is **DISMISSED**.

### 3.      Racial Slurs

In his complaint, Plaintiff states that various Defendants used racial slurs towards him in several of the incidents underlying his complaint [Doc. 7, pp. 5, 7, 8]. However, to the extent that Plaintiff seeks to assert distinct Eighth Amendment claims arising out of the uses of racial slurs by different Defendants in separate incidents, use of slurs and vulgar language, standing alone, does not rise to the level of an Eighth Amendment violation. *Jones Bey v. Johnson*, 248 F. App'x 675, 677 (6th Cir. 2007) (finding that the occasional use of racial slurs, "although unprofessional and reprehensible, does not rise to the level of constitutional magnitude") (quoting *Corsetti v. Tessmer*, 41 F. App'x 753, 755–56 (6th Cir. 2002)); *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (affirming dismissal of Eighth Amendment claim where the plaintiff alleged that a guard continually made insulting remarks accompanied by harassing acts, including pulling the plaintiff too hard during escorts); *Searcy v. Gardner*, No. 3:07-0361, 2008 WL 400424, at *4 (M.D. Tenn. Feb. 11, 2008) ("A claim under 42 U.S.C. § 1983 cannot be based on mere threats, abusive language, racial slurs, or verbal harassment by prison officials."); *Ivey v. Wilson*, 832 F.2d

950, 955 (6th Cir. 1987) (finding verbal abuse and harassment do not constitute "punishment" in the constitutional sense or otherwise raise a constitutional issue). While Plaintiff has alleged that some of the uses racial slurs of racial slurs in his complaint were accompanied by uses of force while he was unrestrained, the Court will address the merits of those excessive force claims *infra*.

As such, Plaintiff's allegations of racial slurs fail to rise to the level of a constitutional violation, and they are **DISMISSED**.

### 4.    Failure to Protect

In his complaint, Plaintiff generally refers to Defendants' failure to protect him from the incidents in his complaint [Doc. 7, pp. 34, 46]. It is well-settled that prison officials have a duty to protect inmates from violence and must take reasonable measures to protect their safety. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). Liability attaches to a prison official's failure to protect a prisoner where the prisoner was "incarcerated under conditions posing a substantial risk of serious harm," and the prison official acted with deliberate indifference to the prisoner's safety. *Id*. at 834. "Deliberate indifference" means that a prison official is liable only where he knows that the inmate faces a substantial risk of serious harm and disregards that risk. *Id*. at 837 (quotation marks omitted).

While Plaintiff generally alleges that prior to the incidents in his complaint, similar incidents had occurred at MCCX, he provides no facts about the prior incidents from which the Court can plausibly infer that any Defendant knew that Plaintiff faced a substantial risk of serious harm but failed to protect him. Accordingly, these formulaic allegations fail to

21

state a claim upon which relief may be granted under § 1983, *Iqbal*, 556 U.S. at 678, and they are **DISMISSED**.

### 5. Excessive Force

As set forth above, Plaintiff seeks to hold Sgt. NoYem, CO Morris, CO Colston, CO Bunch, Sgt. Crabtree, Sgt. Moore, and CO Chevy liable for their uses of force against him, which he alleges violated his rights under the Eighth Amendment. However, for the reasons set forth below, only Plaintiff's allegations that Defendants Sgt. Crabtree and Sgt. Moore used excessive force against him while he was restrained will proceed in this matter against these Defendants in their individual capacities.

### a. Standard

"[T]he unnecessary and wanton infliction of pain" violates the Eighth Amendment's prohibition against cruel and unusual punishment. *Whitley v. Abers*, 475 U.S. 312, 319 (1986); *Hudson v. McMillan*, 503 U.S. 1, 8 (1992). Where a prisoner alleges that an official used excessive force against him, courts must examine two issues to determine whether the force violated the Eighth Amendment: (1) "whether force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm[,]" which is known as the subjective component; and (2) whether the conduct, in context, is sufficiently serious to offend "contemporary standards of decency[,]" which is known as the objective component. *Hudson*, 503 U.S. at 6, 9.

In examining the subjective component, the court considers the need for the use of force, the relationship between the need for force and the force used, the threat the official

reasonably perceived, and the extent of the injury. *Id.* at 7. To satisfy the objective component, a prisoner does not have to incur a serious injury, but the extent of the injury may be probative of whether the force was plausibly "thought necessary" in the situation. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).

But "not every malevolent touch by a prison guard" creates a federal claim, and *de minimis* uses of force that are not repugnant to the conscience do not violate the Eighth Amendment. *Id.* (quoting *Hudson*, 503 U.S. at 9). And a good faith use of force in pursuit of a valid penological objective will rarely, if ever, violate the Eighth Amendment. *Whitley*, 475 U.S. at 319–20; *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Nevertheless, inmates have a clearly established right to be free from excessive uses of force while restrained and/or nonresistant. *See Kidis v. Reid*, 976 F.3d 708, 720 (6th Cir. 2020) (finding that where the defendant "had physical control over the surrendering and unresisting [plaintiff], [the defendant]'s subsequent aggression violated [the plaintiff]'s clearly established right to be free from excessive force"); *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (holding that the "right to be free from excessive force was clearly established" where an officer repeatedly punched handcuffed inmate in the face).

### b. Sgt. NoYem

It appears from Plaintiff's complaint that he asserts that Sgt. NoYem violated his Eighth Amendment rights in the following situations:

(1) Sgt. NoYem pushed Plaintiff after telling Plaintiff to give her his belt, which Plaintiff threw at the table where Sgt. NoYem was sitting, and which fell to the floor; and

23

> (2) After Plaintiff repeatedly punched CO Morris, causing CO Morris to fall to the floor, Sgt. NoYem "began to run at Plaintiff in a threat[en]ing manner with a cocked closed fist in order to strike him saying [a racial slur]," at which point Plaintiff punched her, causing her to hit the floor

[Doc. 7, pp. 3–6].

However, Plaintiff provides no facts about Sgt. NoYem's act of pushing him when he went to pick up his belt from which the Court can plausibly infer that this was anything other than Sgt. NoYem using *de minimis* force that does not implicate constitutional protections. *See Wilkins*, 559 U.S. at 37–38 (noting that "a push or shove that causes no discernable injury almost certainly fails to state a valid excessive force claim") (quoting *Hudson*, 503 U.S. at 8–9) (internal quotation marks omitted).

Additionally, Plaintiff's allegation that after he had repeatedly punched CO Morris in the face, Sgt. NoYem approached him with a closed fist does not allow the Court to plausibly infer that Sgt. NoYem used any use of force against Plaintiff, much less excessive force. While this action does amount to a threat of force, it is apparent from the complaint that Sgt. NoYem was not threatening to use force on Plaintiff maliciously or sadistically, but rather to restore discipline over Plaintiff, who had just punched CO Morris until he fell to the floor and therefore posed a violent threat to prison officials. *Brax v. City of Grand Rapids*, 742 F. App'x 952, 957 (6th Cir. 2008) (finding an officer's "split-second judgment that a single punch was necessary to subdue a drunk, strong, and resisting young [suspect]" was reasonable and therefore did not violate the Fourth Amendment).[5] As such, the Court

---

[5] While the Court evaluates the uses of force against Plaintiff under the Eighth Amendment because he was a convicted prisoner at the time of the incidents in his complaint, the Fourth

24

cannot plausibly infer that this threat of force was subjectively unreasonable, or that it would offend contemporary standards of decency.

Accordingly, the complaint fails to state a claim upon which relief may be granted under § 1983 as to Sgt. NoYem, and this claim is **DISMISSED**.

### c.    CO Morris

As to CO Morris, Plaintiff alleges in pertinent part that after Plaintiff repeatedly protested Sgt. NoYem taking his belt and Sgt. NoYem pushed Plaintiff, Plaintiff turned to face CO Morris and again insisted that the belt issue was not serious [Doc 7, pp. 4–5].  CO Morris then grabbed Plaintiff by the front of his shirt and pushed Plaintiff into the wall, but Plaintiff pushed CO Morris's hand away and again protested prison officials' actions, at which point CO Morris attempted "to throw his fist at [] [P]laintiff in order to c[]ause him harm," so Plaintiff repeatedly punched CO Morris until he fell [*Id.* at 5].

However, Plaintiff provides no facts about CO Morris's act of grabbing his shirt and pushing him into the wall from which the Court can plausibly infer that this was a malicious or sadistic act.  Rather, it is apparent that these acts represented CO Morris using *de minimis* force that does not implicate constitutional protections in order to maintain discipline over

Amendment governs uses of force against free citizens and requires that a use of force be reasonable. *Coley v. Lucas Cnty.*, 799 F.3d 530, 537–38 (6th Cir. 2015).  Thus, as the Sixth Circuit has found that a punch may be reasonable under the Fourth Amendment where a free citizen is resisting restraint, it is apparent that a prison official's use of a punch to subdue a prisoner who had just punched a guard trying to restrain him would also be reasonable and therefore not violate the Eighth Amendment's prohibition on malicious and sadistic uses of force.  *Id.*

25

Plaintiff after (1) Plaintiff's repeated verbal resistance to Sgt. NoYem's requests for his belt, and (2) Plaintiff turning away from Sgt. NoYem. *See Wilkins*, 559 U.S. at 37–38.

Similarly, Plaintiff's allegation that CO Morris attempted to throw a closed fist at him after he pushed CO Morris's hand away does not rise to the level of a constitutional violation. Plaintiff's act of pushing CO Morris's hand away is undeniable physical resistance to CO Morris's *de minimis* attempt to restrain him. And neither the Plaintiff nor the Court can know what degree of force CO Morris would have used with the punch he attempted to throw, as Plaintiff prevented that attempted punch through several punches of his own that left CO Morris on the floor. In short, nothing in the complaint allows the Court to plausibly infer that CO Morris's attempted punch was a malicious or sadistic use of force, rather than a reasonable and legitimate effort to maintain and restore discipline over Plaintiff, who had just used his own physical force to resist CO Morris's attempt to restrain him. *Brax*, 742 F. App'x at 957 (6th Cir. 2008).

Accordingly, the complaint fails to state a claim upon which relief may be granted under § 1983 as to CO Morris, and this claim is **DISMISSED**.

### d.    CO Colston

Plaintiff's only allegation as to CO Colston is that this Defendant approached him from his right side, at which point Plaintiff hit him an unknown number of times before CO Colston backed away [Doc, 7, p. 6]. As these allegations do not allow the Court to plausibly infer that CO Colston used any force or even threatened force against Plaintiff, this claim is **DISMISSED**.

26

### e. CO Bunch

Plaintiff's only allegations against CO Bunch are that after Plaintiff punched CO Morris until he fell on the floor and then kicked CO Morris in the face, CO Bunch "ran into the chow hall aggressively straight at [] [P]laintiff," at which point Plaintiff punched him, and CO Bunch and Plaintiff then wrestled until other officers arrived and handcuffed Plaintiff [*Id.*]. Given the substantial violence Plaintiff had inflicted on other prison officials by the time of CO Bunch's involvement, the Court cannot plausibly infer that any use of force by CO Bunch as set forth in Plaintiff's complaint was malicious or sadistic, rather than a legitimate and *de minimis* use of force to restrain a violent prisoner. Accordingly, the claim against CO Bunch will be **DISMISSED**.

### f. Sgt. Crabtree

Plaintiff's allegations that, while he was handcuffed, Sgt. Crabtree slapped him, spat on him, slammed him on the concrete, and tightened the handcuffs around his wrists [Doc. 7, pp. 6–7] will proceed in this action.

### g. Sgt. Moore

Plaintiff first alleges that, after he was taken into the intake building, and while handcuffed, Sgt. Moore hit him in the head with a black walkie talkie before stating that that was "just the beginning you Black [b*]tch . . . wanna [h]it our pregnant white sister[,] now we are going to show you Black boi [sic]" [Doc. 7, pp. 7–8]. While Plaintiff does not set forth any facts about the degree of force used in this walkie talkie "hit," as it appears that Plaintiff was handcuffed and nonresistant at the time, this claim will proceed herein.

27

On the other hand, Plaintiff's allegation that Sgt. Moore hit him from behind while he was uncuffed after he blocked a kick from CO Chevy does not allow the Court to plausibly infer a violation of Plaintiff's constitutional rights and therefore will not proceed. Specifically, Plaintiff alleges that after he was uncuffed in intake, he blocked an attempted kick from CO Chevy and then got back into his "fighting stan[ce]" [*Id.* at 8]. Plaintiff then felt someone hitting him from behind, so he turned around and hit Sgt. Moore in the chest with his elbow, which knocked Sgt. Moore to the floor. Notably, Plaintiff does not identify Sgt. Moore as the person hitting him in the back in this incident. But even if the Court assumes that Sgt. Moore was the person hitting Plaintiff in the back, it is apparent from the complaint that, at the time this occurred, Plaintiff (1) was uncuffed; (2) had just used physical force on CO Chevy; and (3) was in a fighting stance [*Id.*]. And Plaintiff provides no facts about what degree of force Sgt. Moore used in this hit or any other facts from which the Court can plausibly infer that the hit was malicious or sadistic, rather than another attempt to restore penological control over the physically violent Plaintiff. As such, this allegation fails to state a claim upon which relief may be granted under § 1983 as to Sgt. Moore, and it is **DISMISSED**.

### h. CO Chevy

As to CO Chevy, Plaintiff claims that, after he was taken to intake and thrown to the floor by "all Defendants,"[6] he was able to get his hands in front of himself as he was

---

[6] While Plaintiff generally alleges that "all . . . Defendants/staff" named in his complaint threw him to the floor and uncuffed him when he arrived in the intake building [*Id.* at 8], Plaintiff provides no facts about this incident from which the Court can plausibly infer that any specific

28

uncuffed, at which point CO Chevy attempted to kick Plaintiff in the face, but Plaintiff blocked that attempt, turned around and elbowed Sgt. Moore in the chest, causing Sgt. Moore to fall to the floor, and then started punching CO Chevy [Doc. 7, p. 8].

Given the significant violence that Plaintiff had left in his wake at this point in the factual narrative underlying his complaint, the Court cannot plausibly infer that CO Chevy's act of attempting to kick Plaintiff in his face after Plaintiff was uncuffed and had managed to get his hands in front of him was an excessive use of force that violated the Eighth Amendment. Specifically, the Court cannot know how much force CO Chevy's attempted use of his leg would have used, as Plaintiff blocked the leg from contacting him. Thus, the Court cannot plausibly infer that CO Chevy intended this force to significantly harm Plaintiff, rather than merely bring him back under control. Moreover, at the time that Plaintiff alleges CO Chevy attempted to kick him in the face, Plaintiff had recently punched four prison officials, specifically Sgt. NoYem, CO Morris, CO Bunch, and CO Colston, and had somehow managed to get his hands in front of him after an unspecified prison official uncuffed him. As such, the Court cannot plausibly infer that this kick was malicious and sadistic. Instead, it is apparent that this was a legitimate penological attempt to control Plaintiff. *Davis v. Agosto*, 89 F. App'x 523, 526–27 (6th Cir. 2004) (finding that a "tackle, the twisting of [the plaintiff]'s arm until the handcuffs were in place, the use of

---

Defendant used force against him in a manner that violated his constitutional rights. *Iqbal*, 556 U.S. at 663 (providing that a § 1983 plaintiff "must plead that each Government-official defendant, through his own individual actions, has violated the Constitution").

29

the batons to keep [the plaintiff]'s head down and the use of the taser shield were appropriate" uses of force where the plaintiff had previously been successful in resisting attempts to control him, and that the "three baton blows" that "occurred during the brief interval between when the officers lost control of the resisting inmate and when they brought him under control" also did not rise to the level of a constitutional violation); *Lockett v. Suardini*, 526 F.3d 866, 869, 875–76 (6th Cir. 2008) (finding that officers' acts of "[s]hoving, grabbing, and bending back two of [the plaintiff]'s fingers also required only minimal force and was reasonably related to the need for forcibly bringing [the plaintiff] under control and returning him to his cell").

Accordingly, the complaint fails to plausibly allege that CO Chevy used excessive force against Plaintiff in violation of § 1983, and this claim is therefore **DISMISSED**.

### 6. Retaliation

Plaintiff asserts that Daniel, Toal, Ridenour, Cpl. Herbst, and Capt. Byrd are liable for retaliation because they "took []an[] adverse action against him that would deter a person of ordinary firmness from continuing to engage in [] conduct [and] that [] adverse action was taken (at least in part) because of [] protected conduct . . . ." [Doc. 7, pp. 24–25]. Plaintiff also generally refers a violation of a prohibition on retaliation [*Id.* at 33] and appears to allege that Cpl. Evans retaliated against him by marking his grievance inappropriate and/or failing to process his grievance [*Id.* at 42, 44].

A claim for retaliation in violation of § 1983 has three elements: (1) "the plaintiff engaged in protected conduct"; (2) the defendant took a sufficiently serious adverse action

against the plaintiff that would deter a prisoner of "ordinary firmness" from continuing to engage in the protected conduct; and (3) the plaintiff's protected conduct motivated the adverse action, at least in part. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Plaintiff has not set forth any facts to support a plausible claim for retaliation. Instead, he makes only conclusory references to retaliation and/or recites the elements of a retaliation claim, which do not state a plausible claim for § 1983 relief. *Iqbal*, 556 U.S. at 681. Specifically, while Plaintiff generally alleges that Cpl. Evans's actions regarding his grievance amounted to retaliation, he provides no facts from which the Court can plausibly infer that those actions were due to Plaintiff's protected conduct in filing the grievance, rather than Cpl. Evans's belief that the grievance was improper. And the remainder of Plaintiff's references to retaliation are only conclusory and formulaic.

Accordingly, Plaintiff's complaint fails to assert a plausible § 1983 retaliation claim, and his retaliation allegations are **DISMISSED**.

### 7. Due Process

As set forth above, Plaintiff generally refers to liberty interests, due process, and the Fourteenth Amendment in his complaint and claims that unspecified actions denied him "life, liberty, [and] property . . . without due process" [*See, e.g.,* Doc. 7, pp. 15, 24–25, 44]. The Court liberally construes these references to seek relief for a violation of Plaintiff's right to due process under the Fourteenth Amendment.

In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Supreme Court found that a prisoner is entitled to due process when a sanction "will inevitably affect the duration of

31

his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486–87. Nothing in Plaintiff's complaint allows the Court to plausibly infer that he received a sanction that falls within these parameters, or that any Defendant has otherwise violated his right to due process.

As such, Plaintiff's conclusory allegations regarding due process fail to plausibly allege that any Defendant violated his constitutional rights, and they are **DISMISSED**.

### 8.    Equal Protection

Plaintiff also generally indicates in his complaint that he was subjected to discrimination and that some Defendants used racial slurs in their interactions with him [Doc. 7, pp. 7–8, 33]. However, Plaintiff does not set forth a plausible claim for violation of his right to equal protection.

The Equal Protection Clause commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). In order to state a viable equal protection claim, "a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)). A plaintiff

32

alleging a violation of his right to equal protection must be similarly situated to those individuals with whom he compares himself in all relevant respects. *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 460 (6th Cir. 2011) (providing that "the comparative [prisoner] 'must have dealt with the same [decisionmaker], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [the defendant's] treatment of them for it'" (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998))).

While Plaintiff generally suggests that he was subjected to discrimination based on race and Defendants used racial slurs against him, he does not set forth any facts from which the Court can plausibly infer that any Defendant treated similarly situated inmates of a different race differently than Plaintiff with regard to any incident in the complaint. As such, the complaint fails to allege a plausible equal protection claim, and Plaintiff's equal protection allegations are therefore **DISMISSED**. *See Napolitano*, 648 F.3d at 379 (finding that a complaint failed to state an equal protection claim where it did not "make a plausible allegation that similarly situated . . . individuals, of a different political viewpoint, have not been subject to the same alleged treatment by Defendants"); *Nali v. Ekman,* 355 F. App'x 909, 913 (6th Cir. 2009) (stating that a claim for race discrimination in prison discipline must be supported by allegations "that the people not disciplined were similarly situated and of a different race" to state an equal protection claim).

33

### 9. Effective Grievance Procedure

Plaintiff makes various allegations against Cpl. Evans regarding his handling of Plaintiff's grievance [Doc. 7, p. 42]. However, as the Court has noted, Plaintiff is not entitled to an effective grievance procedure. *Argue*, 80 F. App'x at 430. Thus, to the extent that Plaintiff's complaint can be construed to seek § 1983 relief against Cpl. Evans and others based on MCCX's lack of an effective grievance procedure, these allegations fail to state a claim upon which relief may be granted under § 1983, and they are **DISMISSED**.

### 10. Investigation and Discipline

Plaintiff also demands an investigation of the incidents in his complaint [Doc. 7, p. 21] and asks that Commissioner Strada discipline other Defendants [*Id.* at 48]. But Plaintiff does not have a constitutional right to an investigation. *Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation." (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973))). Further, the Court does not have the ability to require a TDOC official to initiate disciplinary proceedings against its employees. *Dickson v. Burrow*, No. 5:19-CV-P163-TBR, 2019 WL 6037671, at *2 (W.D. Ky. Nov. 14, 2019) (citing *Ross v. Reed*, No. 1:13-CV-143, 2013 WL 1326947, at *2 (S.D. Ohio Mar. 5, 2013) for its holding that "[t]he Court has no authority under § 1983 to direct the . . . police department to initiate any disciplinary proceedings against its employees").

Thus, these requests have no merit in this action, and they are **DISMISSED**.

34

### 11.    Disciplinary Report

Plaintiff claims that the disciplinary report against him does not comply with TDOC policy and contains a lie [Doc. 7, pp. 22–23, 46].  But Plaintiff's allegation that this disciplinary report does not comply with TDOC policies does not state a claim upon which relief may be granted under § 1983, which allows prisoners to recover only for a violation of federal constitutional or statutory rights.  *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 322 (6th Cir. 2023) ("Alone, the failure to follow an internal policy does not give rise to a deliberate indifference claim." (citing *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 578 (6th Cir. 2020))); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citation omitted). Also, Plaintiff's allegation that the disciplinary report contains a lie does not rise to the level of a constitutional violation.  *McDougald v. Eaches*, No. 1:16-CV-900, 2016 WL 7015834, at *3 (S.D. Ohio Sept. 16, 2016) (citations omitted) (providing that "erroneous or even fabricated allegations of misconduct by an inmate, standing alone, do not constitute the deprivation of a constitutional right").

As such, Plaintiff's allegations regarding the disciplinary report against him fail to state a claim upon which relief may be granted under § 1983.

### 12.    Civil Conspiracy

As set forth above, Plaintiff's complaint refers to a civil conspiracy and §§ 1343 and 1985 [Doc. 7, pp. 19–20, 23–24, 37, 44; Doc. 7-1 pp. 21–23].  The Court liberally construes these allegations to seek to hold Defendants liable under both § 1983 and § 1985 for civil conspiracy.

35

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Crowley v. Anderson Cnty.*, 783 F. App'x 556, 560 (6th Cir. 2019) (internal quotation marks and citation omitted). To state a § 1983 conspiracy claim, Plaintiff must demonstrate "'that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court defined the four elements of a § 1985(3) conspiracy claim as requiring (1) a conspiracy of two or more persons, (2) a racial or other class-based, invidiously discriminatory animus behind the conspirators' actions, (3) an act in furtherance of the conspiracy, and (4) consequential injury to a person or property or deprivation of a right or privilege of a citizen of the United States. *Id.* at 102–03.

Because "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . circumstantial evidence may provide adequate proof of conspiracy." *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) (alteration in original). Nevertheless, both § 1983 and § 1985(c) conspiracy claims are subject to "relatively strict" pleading requirements that require "some degree of specificity." *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008) (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)); *Dallas v. Holmes*, 137 F. App'x 746, 752 (6th Cir.

36

2005) ("Conspiracy claims under § 1985(3) must be pleaded with the same specificity as conspiracy claims under § 1983.") (citation omitted).

While Plaintiff alleges that Defendants and other MCCX officials used racial slurs in interactions with him and that some of those interactions were violent, he presents no facts suggesting that this was due to a plan between two or more individuals. To the contrary, it appears that each use of force and/or verbal incident in Plaintiff's complaint occurred due to Defendants' personal reactions to Plaintiff's resistance to prison officials' authority and/or violence toward themselves or other prison officials. Also, Plaintiff's allegation that Cpl. Evans is liable for civil conspiracy based on his treatment of Plaintiff's grievance provides no facts about any other person with whom Cpl. Evans could or would have conspired. And while Plaintiff also alleges that the disciplinary report against him supports a claim for civil conspiracy, that report appears to be routine and contains no evidence of a planned conspiracy against Plaintiff [Doc. 7-1, pp. 21–23]. Moreover, as the Court noted above, even fabricated disciplinary proceedings would not violate Plaintiff's constitutional rights. *McDougald*, 2016 WL 7015834, at *3.

Accordingly, Plaintiff's complaint fails to state a plausible claim for civil conspiracy based on § 1983 or § 1985, and all such allegations are **DISMISSED**.

### 13. State Law Violations

Plaintiff repeatedly alleges in his complaint that Defendants have violated TDOC policy and/or Tennessee law, including through breach of contract and intentional infliction of emotional distress. However, these allegations fail to allege a claim upon which relief

37

may be granted under § 1983. *Helphenstine*, 60 F.4th at 322 (citation omitted); *Pyles*, 60 F.3d at 1215; *Jordan v. Brown*, No. 1:16-CV-0001, 2016 WL 128520, at *2 (M.D. Tenn. Jan. 12, 2016) ("Breach of contract is a state-law issue. Neither the Eighth Amendment nor any other provision of the United States Constitution provides a basis for a prisoner to recover against prison officials for breach of a contract.); *Voyticky v. Vill. of Timberlake, Ohio*, 412 F.3d 669, 678 (6th Cir. 2005) (noting that "intentional infliction of emotional distress, by itself, cannot amount to a constitutional violation" and therefore evaluating it as a state law claim).

Accordingly, these allegations are **DISMISSED**.

### 14. Municipal Liability

As set forth above, Plaintiff also seeks relief under § 1983 relief from Morgan County and makes various references to municipal liability. However, all the incidents underlying Plaintiff's complaint occurred in the MCCX, which, as the Court set forth above, is run by the TDOC, not Morgan County or any other municipality. Thus, Plaintiff's allegations regarding municipal liability fail to state a claim upon which relief may be granted under § 1983, and Morgan County is **DISMISSED**.

### 15. Supervisory Liability

In his complaint, Plaintiff seeks relief under § 1983 against Warden Parris, Commissioner Strada, and Warden Simms based on supervisory liability. However, Plaintiff does not provide any facts from which the Court can plausibly infer that these Defendants may be liable under § 1983 based on this theory.

38

The Sixth Circuit has held that government officials may be individually liable under § 1983 for a failure to supervise if they "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011); *Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 487–88 (6th Cir. 2020) (providing that "at minimum a plaintiff must show that a supervisory official at least implicitly authorized, approved[,] or knowingly acquiesced in the unconstitutional conduct of the offending subordinate" in order for the supervisory official to be liable for a subordinate's acts under § 1983) (internal quotation marks and citations omitted). Additionally, a supervisor may be liable § 1983 if he or she "abandon[s] the specific duties of [his or her] position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Troutman*, 979 F.3d at 487.

Plaintiff provides no facts from which the Court can plausibly infer that any supervisory Defendant directly participated in the incidents underlying his complaint. He also does not provide any facts from which the Court can plausibly infer that any of these Defendants abandoned their duties despite knowledge of a breakdown in the prison. While Plaintiff generally claims that Warden Parris had failed to discipline officers for similar incidents in the past, Plaintiff provides no facts about the alleged prior similar incidents from which the Court can plausibly infer that they represent a breakdown of proper operations at the MCCX.

As such, Plaintiff's allegations regarding supervisory liability fail to state a plausible claim for § 1983 relief, and they are **DISMISSED**.

39

### 16.    Failure to Train and Supervise

Plaintiff also seeks to assert § 1983 claims for failure to train and supervise employees. But this is generally a claim for municipal liability, which is not appropriate herein for the reasons set forth above. Thus, to the extent that Plaintiff seeks to assert claims against individual Defendants for their alleged failure to train employees, these claims "improperly conflate[] a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey*, 453 F. App'x at 563 (quotation omitted) (citing *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (same). Such claims could only be cognizable against Defendants in their official capacities. *Harvey*, 453 F. App'x at 563. But, as set forth above, Plaintiff cannot proceed against Defendants in their official capacities in this action.

As such, Plaintiff's claims for failure to train employees fail to state a claim upon which relief may be granted under § 1983, and they are **DISMISSED**.

### 17.    Conditions of Confinement and Medical Care

As set forth above, Plaintiff makes general references to his "right to adequate food, shelter, clothing, [and] medical" and claims that the MCCX's "sanitary conditions [and] bedding were deplorable [and] specific medical care was deplorable . . . ." [Doc. 7, pp. 14, 35]. But Plaintiff sets forth no facts from which the Court can plausibly infer that any condition of his confinement has caused an extreme deprivation of a life necessity in violation of his Eighth Amendment rights. *Hudson v. McMillan*, 503 U.S. 1, 8–9 (1992) (providing that allegations of "extreme deprivations" that deny a prisoner "'the minimal

40

civilized measure of life's necessities" support a cognizable Eighth Amendment conditions-of-confinement claim) (citations and quotations omitted). Nor has Plaintiff set forth any facts suggesting that any Defendant was personally involved in, or even aware of, any inadequacies in the conditions of his confinement or his medical care. As such, these allegations fail to allow the Court to plausibly infer any Defendant violated Plaintiff's constitutional rights, and they are **DISMISSED**.

### 18. Remaining Claims

The Court has attempted to address all allegations from Plaintiff's complaint that it construes to attempt to state a claim for relief. But due to the dense and jumbled nature of Plaintiff's complaint, the Court may not have addressed each such allegation. Thus, to the extent that Plaintiff seeks § 1983 relief based on other allegations in the complaint that the Court has not already addressed, the Court finds that those allegations fail to plausibly allege a violation of § 1983, and they are therefore **DISMISSED.**

## V. SERVICE OF PROCESS AND FEES

Plaintiff has also filed an unsigned motion regarding service of process [Doc. 8] and an unsigned and unintelligible motion regarding fees [Doc 9].

But as these motions are unsigned, Plaintiff again has not complied with Rule 11 of the Federal Rules of Civil Procedure. Accordingly, the Clerk is **DIRECTED** to send Plaintiff a copy of these motions [Docs. 8, 9]. Plaintiff shall have fifteen (15) days from the date of entry of this order to return a signed copy of these motions to the Court. If

41

Plaintiff does not comply, the Clerk is **DIRECTED** to strike these motions [*Id.*] without further order of the Court, in accordance with Rule 11(a).

## VI.    REQUEST FOR ISSUANCE OF SUMMONSES

Plaintiff also filed a motion requesting issuance of summonses [Doc. 10]. This motion [*Id.*] is **GRANTED in part** only to the extent that the Court enters the instant memorandum and order and **DENIED in part** to the extent that the motion seeks any other relief.

## VII.    CONCLUSION

For the reasons set forth above:

1.    The Clerk is **DIRECTED** to update the Court's docket to reflect the spelling of Plaintiff's name in the case style on this memorandum and order and to name all Defendants in that case style;

2.    The Clerk is **DIRECTED** to send Plaintiff a copy of his unsigned motions [Docs. 8, 9]. Plaintiff shall have fifteen (15) days from the date of entry of this order to return signed copies of the motions to the Court. If Plaintiff does not comply, the Clerk is **DIRECTED** to strike all of those motions [*Id.*] without further order of the Court, in accordance with Rule 11(a);

3.    Plaintiff's motions regarding deadlines [Docs. 1, 2] are **DENIED**;

4.    Plaintiff's motion for leave to proceed *in forma pauperis* [Doc. 6] is **GRANTED**;

5.    Plaintiff is **ASSESSED** the civil filing fee of $350.00;

6.    The custodian of Plaintiff's inmate trust accounts is **DIRECTED** to submit the filing fee to the Clerk in the manner set forth above;

7.    The Clerk is **DIRECTED** to provide a copy of this memorandum opinion and order to the custodian of inmate accounts at the institution where Plaintiff is now confined and the Court's financial deputy;

42

8.     Plaintiff's motion to supplement his complaint [Doc. 11] is **DENIED**;

9.     Even liberally construing the complaint in favor of Plaintiff, it fails to state a claim upon which relief may be granted under § 1983, except his claims alleging that Sgt. Crabtree and Sgt. Moore used excessive force against him while he was restrained in handcuffs;

10.    All Defendants except Sgt. Crabtree and Sgt. Moore and all claims except those in which Plaintiff alleges Sgt. Crabtree and Sgt. Moore used excessive force against him while he was restrained are **DISMISSED**;

11.    Plaintiff's motion regarding entry of summonses [Doc. 10] is **GRANTED in part** only to the extent that the Court enters the instant memorandum opinon and order and **DENIED in part** to the extent that it seeks any other relief;

12.    The Clerk is **DIRECTED** to send Plaintiff service packets (a blank summons and USM 285 form) for Sgt. Crabtree and Sgt. Moore;

13.    Plaintiff is **ORDERED** to complete the service packets and return them to the Clerk's Office within twenty (20) days of entry of this order;

14.    At that time, the summonses will be signed and sealed by the Clerk and forwarded to the U.S. Marshal for service, *see* Fed. R. Civ. P. 4;

15.    Service on Sgt. Crabtree and Sgt. Moore shall be made pursuant to Rule 4(e) of the Federal Rules of Civil Procedure and Rule 4.04(1) and (10) of the Tennessee Rules of Civil Procedure, either by mail or personally if mail service is not effective;

16.    Plaintiff is **NOTIFIED** that if he fails to timely return the completed service packet, this action may be dismissed;

17.    Sgt. Crabtree and Sgt. Moore shall answer or otherwise respond to the complaint within twenty-one (21) days from the date of service.  If any Defendant fails to timely respond to the complaint, it may result in entry of judgment by default against him;

18.    Plaintiff is **ORDERED** to immediately inform the Court and Defendants or their counsel of record of any address changes in writing.  Pursuant to Local Rule 83.13, it is the duty of a pro se party to promptly notify the Clerk and the other parties to the proceedings of any change in his or her address, to monitor the progress of the case, and to prosecute or defend the action

diligently. E.D. Tenn. L.R. 83.13. Failure to provide a correct address to this Court within fourteen days of any change in address may result in the dismissal of this action.

IT IS SO ORDERED.

ENTER:

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE